IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                    Criminal No. ELH-19-0302

JARREL LAMONT ANDERSON,
*Defendant*.

## MEMORANDUM OPINION

Jarrel Lamont Anderson, defendant, entered a plea of guilty on June 28, 2021, to the offenses of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841, 846, and possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841.  ECF 144.  The plea was tendered pursuant to a Plea Agreement. ECF 146 ("Plea Agreement").  In the Plea Agreement, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to concurrent sentences of 102 months of imprisonment for each offense.  *Id.* ¶ 8.  At sentencing on October 22, 2021 (ECF 158), the Court sentenced the defendant to a total term of 102 months of imprisonment.  ECF 159 ("Judgment").

Defendant, who is now self-represented, filed a "Motion for Reduction of Sentence Pursuant to 18 USC 3582 as Amended by the FSA of 2018," seeking a reduction of his sentence to time served.  ECF 176; ECF 176-1 (collectively, the "Motion").  He also filed exhibits.  ECF 176-2 to ECF 176-4.  The Office of the Federal Public Defender declined to represent defendant in connection with the Motion. ECF 180.  The government opposes the Motion.  ECF 183 ("Opposition").  Defendant has replied.  ECF 185 ("Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.      Background

In a five-count Indictment returned on June 19, 2019 (ECF 1), a grand jury in the District of Maryland charged Anderson and two others with one count of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841, 846 (Count One).  The Indictment specified a conspiracy period of 2011 through April 23, 2019.  In addition, Anderson was charged with possession with intent to distribute cocaine base on April 23, 2019, in violation of 21 U.S.C. § 841 (Count Two); possession of a firearm on April 23, 2019, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three); and possession of a firearm by a felon, also on April 23, 2019, in violation of 18 U.S.C. 922(g) (Count Four).[1]

As noted, on June 28, 2021, Anderson entered a plea of guilty to Count One and Count Two of the Indictment.  ECF 144.  The Plea Agreement (ECF 146) contained a stipulation of facts. It provided, *id.* at 11:

> In the winter and early spring of 2019, the Baltimore County Police Department and Drug Enforcement Administration were conducting an investigation into the distribution of large quantities of cocaine in Baltimore City and Baltimore County, Maryland. The investigation, which employed judicially authorized wiretaps and physical and electronic surveillance, ultimately identified the Defendant, Jarrel Lamont Anderson, as a distributor of cocaine and crack cocaine.
>
> In March and April 2019, the Defendant agreed to sell—and thereafter did sell—quantities of cocaine to a downstream purchaser at or in the vicinity of the Horseshoe Casino in Baltimore, Maryland. The Defendant obtained the cocaine from an upstream supplier that he was involved with. Two of the transactions with the aforementioned buyer involved several ounces of cocaine; and a third involved 1.5 kilograms. Specifically, on March 25, 2019, the Defendant sold 1.5 kilograms of cocaine to this buyer for an agreed upon price of $35,000; the Defendant knew that the buyer intended to turn around and sell a kilogram of the total to a distinct third-party buyer.

---

[1] Codefendant James Richard Morgan was the sole defendant named in Count Five, which charged a drug offense that occurred on April 23, 2019.

On April 23, 2019, law enforcement executed a series of search warrants on the Defendant and his properties. Searches of the Defendant and his vehicle yielded several thousand dollars in U.S. Currency, approximately 42 grams of cocaine base (or "crack" cocaine), a loaded ATM Automag .22 caliber pistol, and drug packaging paraphernalia. The Defendant admits that he possessed the cocaine base with the intent to distribute it. The Defendant further admits that he knowingly possessed the Automag pistol, a firearm that had traveled in interstate commerce, knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year.

In the Plea Agreement, the parties agreed that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Anderson had a base offense level of 26, pursuant to § 2D1.1(c).  *Id.* ¶ 6(a).  The parties also agreed that "the offense level is increased by 2 levels pursuant to U.S.S.G. § 2D1.1(b)(1) because a firearm was possessed."  *Id.* ¶ 6(b).  Further, the government agreed to three deductions for acceptance of responsibility, under U.S.S.G. § 3E1.1. *Id.* ¶ 6(d).  However, there was no agreement as to the defendant's criminal history.  *Id.* ¶ 6(c).

The offenses charged in Count One and Count Two each carried a mandatory minimum sentence of five years of imprisonment.  ECF 146, ¶ 3.  As noted, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed "that a sentence of 102 months' imprisonment on each of Counts One and Two (each sentence running concurrent to the others) is the appropriate disposition of this case."  *Id.* ¶ 8.  Defendant reserved the right to appeal any sentence that exceeded 102 months, and the government reserved the right to appeal if the total term of imprisonment was less than 102 months.  *Id.* ¶ 10(b)(i), (ii).

The Presentence Report (ECF 151, "PSR") reflected that defendant had a base offense level of 26 under U.S.S.G. §§ 2D1.1(a)(5), (c)(7).  *Id.* ¶ 15.  Pursuant to U.S.S.G. § 2D1.1(b)(1), defendant's offense level was increased to 28 because he possessed a loaded firearm.  *Id.* ¶ 16. After a three-level deduction for acceptance of responsibility, under U.S.S.G. § 3E1.1, defendant had a final offense level of 25.  *Id.* ¶¶ 22–24.

According to the PSR, Anderson had four prior convictions, all in Maryland state courts. *Id.* ¶¶ 29–32.  In 2007, Anderson was convicted of burglary in the Circuit Court for Baltimore County, for which he received a sentence of 90 days of imprisonment. *Id.* ¶ 29.  Also in 2007, in the Circuit Court for Baltimore County, Anderson was convicted of first-degree assault, for which he received a sentence of 25 years of imprisonment, with all but 18 months suspended.  *Id.* ¶ 30. In 2008, in the Circuit Court for Baltimore County, defendant was convicted of identity theft and theft of a value greater than $500, for which he received five years of incarceration, all suspended, and three years of probation.  *Id.* ¶ 31.  Finally, in 2010, defendant was convicted in the Circuit Court for Baltimore City of possession of a firearm by a felon; having a handgun in a vehicle on a public road; and possession of drug paraphernalia.  *Id.* ¶ 32.  He received a total sentence of eight years of incarceration and served about three years.  *Id.*

The PSR reflected that Anderson had a criminal history score of 11 points, which established a criminal history category of V.   *Id.* ¶ 35.  Based on an offense level of 25 and a criminal history category of V, the Guidelines called for a sentence ranging from 100 months to 125 months of imprisonment.  *Id.* ¶ 59.

At the time of sentencing on October 22, 2021, Anderson was 32 years old.  *See* ECF 151 at 3.  The Court sentenced Anderson to 102 months of imprisonment as to Count One and 102 months of imprisonment as to Count Two, concurrent, with credit for time served from April 23, 2019, to April 29, 2019, and from July 24, 2019, to the date of sentencing.  ECF 159 at 2.

Anderson, who is now 35 years old, is currently incarcerated at the Federal Correctional Institution at Fort Dix in New Jersey.  *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Dec. 28, 2023).  Accounting for time served before sentencing, defendant has served a little over 53 months, or about 52 percent of his sentence.  *See*

ECF 159 at 2.  He has a projected release date of March 27, 2026.  *See Find an inmate*, *supra*, https://www.bop.gov/inmateloc/.

## II.     Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Centeno-Morales*, ___ F.4th ___, 20204 WL 58475, at *2 (4th Cir. Jan. 5, 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One exception is when the modification is "expressly permitted by statute."  *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.  The First Step Act ("FSA"), enacted in 2018, constitutes an exception to the general rule.  *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also Centeno-Morales*, 2024 WL 58475, at *2; *United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984.  As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*,

754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was an infrequent occurrence, because the BOP rarely filed such a motion on an inmate's behalf. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).  However, as a result of the enactment of the First Step Act in December 2018, a federal inmate could file a motion for compassionate release directly with the court, so long as the inmate first exhausted administrative remedies.

Simply put, with the passage of the FSA in 2018, Congress "broadened" the authority of courts to grant sentencing modifications.  *Malone*, 57 F.4th at 173.  Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194.  This provision is an exception to the ordinary rule that a federal sentence is final.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).  The FSA resulted in a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis

added).  That is, once a defendant has exhausted his administrative remedies, or after 30 days have

passed from the date on which the warden has received the defendant's request, the defendant may

petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th

at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.[2]

Nonetheless, there are restrictions.  Under 18 U.S.C. § 3582(c)(1)(A), the court may

modify the defendant's sentence only if two criteria are met.  *Brown*, 78 F.4th at 128; *Bethea*, 54

F.4th at 831.  In other words, the analysis consists of "two steps," *Bond*, 56 F.4th at 383, and "the

district court must conduct a two-step analysis."  *Cantero-Morales*, 2024 WL 58475, at *2.

"First, the court must determine the prisoner is eligible for a sentence reduction because he

has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831

(citation omitted); *see also Bond*, 56 F.4th at 383; *Hargrove*, 30 F.4th at 194-95; *United States v.*

*Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383

(2021).  If that criterion is met, the court "must then find that release is appropriate under the 18

U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th

at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997

F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Significantly, "many case-specific facts fit under the broad umbrella of the Section 3553(a)

factors."  *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020).  Moreover, under the

criterion of "respect for the law," the court may consider a defendant's plea agreement.  *Bond*, 56

F.4th at 384.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A)

analysis."  *Jenkins*, 22 F.4th at 169; *see Centeno-Morales*, 2024 WL 58475, at *3; *Bond*, 56 F.4th

---

[2] Section 3582(c)(1)(A) "does not require issue exhaustion."  *Ferguson*, 55 F.4th at 269.

at 384; *Bethea*, 54 F.4th at 834; *Kibble*, 992 F.3d at 330.  Of import, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Notably, "when the same judge who sentenced the defendant rules on the compassionate release motion," it weighs against the finding of an abuse of discretion.  *Bethea*, 54 F.4th at 834 (citation omitted); *see Centeno-Morales*, 2024 WL 58475, at *3.  As the Fourth Circuit has said, "[w]hen the same sentencing judge assesses the § 3553(a) factors again for compassionate release purposes, there's a strong indication that the judge knows of the defendant's circumstances, both favorable and unfavorable, and considers the totality of the record when assessing whether a different sentence is now warranted."  *Bethea*, 54 F.4th at 834 (citation omitted).  Nevertheless, a district court abuses its discretion if "'it acts arbitrarily or irrationally, fails to follow statutory requirements, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error or flaw.'"  *Centeno-Morales*, 2024 WL 58475, at *4 (citation omitted).

As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).  The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement").  As discussed below, amendments to the Policy Statement took effect on November 1, 2023.

Prior to the amendments, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. 1B1.13 (2021). Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 781 F.3d at 281. As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As mentioned, the Fourth Circuit based its holding in *McCoy* and other cases on a version of the Policy Statement that has since been amended, effective November 1, 2023. *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress). In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A). *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the

Guidelines, as amended.  This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A). [3]

A court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions.  18 U.S.C. § 3582(c)(1)(A).  The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> > (1) (A) extraordinary and compelling reasons warrant the reduction; or
> >
> > (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
> >
> > (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
> >
> > (3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence.  *Id.* § 1B1.13(b)(1)–(6).  These include certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's

---

[3] Defendant's Motion was filed on November 7, 2022 (ECF 176), before the amendments to U.S.S.G. § 1B1.13 took effect.  But, the Court applies the law in effect at the time of its decision, not the law in effect at the time the Motion was filed.  *Cf. Maryland Shall Issue, Inc. v. Governor Wes Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023) (ruling in accordance with law in effect at the time of the appellate decision, not the law in effect at the time of the district court's decision).  In any event, I would reach the same outcome under the law in effect before the amendments of November 1, 2023.

age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3. However, such developments did not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

Of relevance, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." However, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*

Section 1B1.13(d) of the Policy Statement is also relevant. It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.*

Of import, a defendant may not collaterally attack his conviction or sentence by way of a compassionate release motion. *Ferguson*, 55 F.4th at 270. Rather, a petition under 28 U.S.C. § 2255 "is the exclusive method" to collaterally attack a federal conviction or sentence, and a defendant cannot use a compassionate release motion "to sidestep § 2255's requirements." *Id.*; *see also id.* at 272; *In re Vial*, 115 F.3d 1992, 1194 (4th Cir. 1997) (en banc).

Even if a defendant establishes an extraordinary and compelling reason that warrants relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis);

*United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors).  Notably, the recent amendments to the Guidelines did not alter this requirement.

The "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).  As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500).  And, in weighing the § 3553(a) factors, including the factor of respect for the law, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.  COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[4]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease*

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

*(COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.   That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious.  *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit has put it, in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19

pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms. But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, Reuters (May 12, 2022), https://perma.cc/TLA5-YNFB. And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19. The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down

syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

## B.

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589. At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.* Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting. *Seth*, 461 F. Supp. 3d at 248. Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-

0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social

18

distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 461 F. Supp. 3d at 248. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

19

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

As of May 11, 2023—the last day on which the CDC updated its vaccine tracker— approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people

from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See* *COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

Much has changed since the coronavirus first emerged in early 2020.  And, the virus, too, has changed repeatedly, with multiple strains and variants.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States.  Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent. *See* *COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated Dec. 16, 2023). Moreover, available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently,

or is no longer reported at all." *Track Covid-19 in the U.S.*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated Dec. 27, 2023).

## IV.    Discussion

### A.

Anderson maintains that he has satisfactorily pursued his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).  ECF 176 at 3.  He has attached to the Motion an "Inmate Request to Staff" form, dated September 18, 2022, addressed to "Warden Christensen," in which defendant requests a reduction in sentence.  ECF 176-3 at 2.  Defendant also attached a completed "Compassionate Release/Reduction in Sentence" form, dated September 18, 2022.  *Id.* at 3.

I am satisfied that Anderson has exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).  On September 18, 2022, Anderson appears to have submitted an "Inmate Request to Staff" addressed to "Warden Christensen," which stated, in part:  "Sir, please accept this formal correspondence, as a notice that I am requesting consideration for Reduction in Sentence, pursuant to the CARES ACT, 18 USC § 3582(c)(1)(A) and the First Step Act."  ECF 176-3 at 2.  Also on September 18, 2022, Anderson appears to have completed a "Compassionate Release/Reduction in Sentence" form.

Defendant has not provided any information to the Court about whether or how the BOP responded to these requests.  But, the government does not contest that defendant has exhausted administrative remedies.

Therefore, I am satisfied that defendant has exhausted his administrative remedies, in satisfaction of 18 U.S.C. § 3582(c)(1)(A).  I turn to the merits.

**B.**

Anderson posits that there are at least three extraordinary and compelling reasons for compassionate release.  First, he argues that compassionate release is warranted because he has several medical conditions, including asthma, hypertension, and post-traumatic stress disorder ["PTSD"], which leave him especially vulnerable to severe infection with COVID-19.  ECF 176 at 6, 9–10; ECF 176-2.  Defendant claims that his PTSD arose "[b]ecause of the stressor[s] caused by the pandemic."  ECF 176 at 10.

Defendant argues, second, that his sentence is disparately long in relation to the sentence he would receive if he were sentenced "in light of the Equal Act[6], which still has not been signed into law."  *Id.* at 11.  Third, Anderson argues that compassionate release is warranted by his post-sentencing rehabilitation.  *Id.*  In this regard, he attaches records evidencing his completion of numerous prison education courses.  ECF 176-4.

In its Opposition, the government argues that Anderson has "fail[ed] to cite or document any real exacerbating health factors that might make his exposure to COVID more acute."  ECF 183 at 6.  In particular, the government contends that "there is no documentation to substantiate [defendant's] claims" that he has asthma or hypertension.  *Id.*  Moreover, with respect to defendant's alleged PTSD, the government contends that "[w]hat the defendant describes appears to be a general mental health fear associated with being in prison itself."  *Id.* at 7.  According to the government, "Anderson has presented no specific mental health diagnosis that cannot be

---

[6] The Equal Act was a bill introduced during the 117th Congress that would have eliminated the federal sentencing disparity between drug offenses involving crack cocaine and powder cocaine.  *See* S.B. 79, 117th Cong. (2021).  The Senate did not adopt the bill and it did not become law.  *Summary:  S.79—117th Congress (2021–2022)*, CONGRESS.GOV, https://www.congress.gov/bill/117th-congress/senate-bill/79 (last visited Dec. 29, 2023).

managed in prison, and his generalized fears associated with incarceration are simply not sufficient" for relief. *Id.*

With respect to Anderson's claim that he would receive a lesser sentence if sentenced under the Equal Act, the government observes that "Anderson cannot claim a disparity based on legislation that is not in place." *Id.* And, with respect to Anderson's claim that compassionate release is warranted based on his post-sentencing rehabilitation, the government asserts that "post-conviction rehabilitation by itself should not be considered an extraordinary circumstance." *Id.* at 8 (citing 28 U.S.C. § 994(t)).

The government also argues that the sentencing factors under 18 U.S.C. § 3553(a) counsel against reducing Anderson's sentence. *Id.* at 9–11. With respect to "the seriousness of the offense and the need to provide just punishment," the government states that "the defendant was engaged in large-scale cocaine trafficking" and "was making kilogram-level deals on the government's wiretap." *Id.* at 10. In addition, the government observes that, "when a search warrant was executed, law enforcement found a pistol in [defendant's] residence." *Id.*

As to the Court's interest in "promoting respect for the law and [ensuring] adequate deterrence," the government maintains that it would be inappropriate to release defendant when he "still ha[s] a significant portion" of his sentence remaining. *Id.* Moreover, according to the government, "defendant's request" for a reduction in his sentence to time served "flies in the face of the c-plea agreement reached by the parties and endorsed by the Court," *id.*, by which Anderson agreed to a 102-month sentence. *Id.* at 2, 10-11 (citing *Bond*, 56 F.4th 381). In the government's view, defendant's request for compassionate release is an attempt "to wholly abrogate that agreement." ECF 183 at 10.

With respect to the need to protect the public from further crimes of the defendant, the government observes that, in denying defendant's request for pretrial release, this Court remarked that defendant "poses a danger to the community if released" and that his "criminal history also illustrates that he presents a serious risk to public safety." *Id.* at 11 (quoting ECF 79 at 6, 7). The government asserts that the Court's interest in protecting the public requires denial of Anderson's Motion.

Finally, the government maintains that defendant's participation in prison education programs, although "laudable," is not "so extraordinary" as to "merit release." ECF 183 at 11. According to the government, "the compassionate release remedy is one that should be rare and reserved for special circumstances." *Id.* But, in the government's view, "[s]pecial circumstances are . . . not present here," because defendant's participation in prison education programs is "not particularly unique." *Id.*

In his Reply, Anderson reiterates that he has certain medical conditions that place him at greater risk of severe infection with COVID-19. ECF 185 at 2. He attached to the Reply a handwritten note bearing his signature, dated February 6, 2023, which states: "I am asking the courts to obtain a copy of my medical files. I sent an informal request here at my facility, but I have not gotten a response. They say it may take up to 30 days for a response." ECF 185-1.

Since the filing of the Reply, defendant has not provided the Court with further information about his asserted medical conditions or the status of his request for his medical records. *See* Docket. But, the Court notes that in cases of this nature, it is not uncommon for the government to submit the defendant's medical records. Yet, it did not do so here.

**C.**

Defendant contends that relief is warranted because he has certain medical conditions that make him especially vulnerable to severe illness from COVID-19.

As indicated, effective November 1, 2023, § 1B1.13(b)(1) of the Policy Statement identifies four circumstances under which a defendant's medical condition may provide an extraordinary and compelling reason for relief. *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D). First, under § 1B1.13(b)(1)(A), "a terminal illness (*i.e.,* a serious and advanced illness with an end-of-life trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia," may provide an extraordinary and compelling reason for relief. Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of . . . aging," and such condition or impairment "substantially diminishes" the defendant's ability to care for himself. Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason may exist if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."

Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

(i)     the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)    such risk cannot be adequately mitigated in a timely manner.

In my view, Anderson has not demonstrated an entitlement to relief under any of the four provisions set forth above.  Although defendant claims that he has asthma and hypertension, he has not provided the Court with a basis on which to conclude that, in fact, he has these conditions. Defendant's assertion that he has PTSD "from the continuous lock downs at FCI Ray Brook" is likewise unsubstantiated.  ECF 176.

In any event, even if I were to accept defendant's unsubstantiated assertion that he is affected by asthma, hypertension, and PTSD, I would be without a basis for concluding that these conditions meet the criteria for relief under §§ 1B1.13(b)(1)(A)–(D) of the Policy Statement. Therefore, given the paucity of information available to the Court about defendant's alleged medical conditions, I have no basis at this juncture on which to conclude that defendant's medical conditions provide an extraordinary and compelling reason for relief.

The possibility that defendant might receive a lesser sentence if sentenced according to the Equal Act also fails to provide an extraordinary and compelling reason for relief.  To be sure, § 1B1.13(b)(6) of the Policy Statement contemplates that, in some circumstances, "a change in the law . . . may be considered in determining whether the defendant presents an extraordinary and compelling reason."  However, defendant has not identified any change in the law under which he was sentenced.

To be sure, defendant's post-sentencing rehabilitation is commendable.  But, the Policy Statement makes clear that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for" relief.  § 1B1.13(d).

In sum, I conclude that defendant has not demonstrated an extraordinary and compelling reason for compassionate release.

27

**D.**

Even if I were to determine that Anderson has demonstrated an extraordinary and compelling reason for compassionate release, I would conclude that the sentencing factors under 18 U.S.C. § 3553(a) counsel against a grant of relief.

As noted, both offenses to which defendant pleaded guilty carry a mandatory minimum sentence of five years, or 60 months, of imprisonment.  ECF 151, ¶ 58.  Even accounting for concurrent sentences, defendant has only served about 53 months in prison, which is less than the mandatory minimum term of imprisonment for the offenses to which he pleaded guilty.  To award defendant a sentence below the mandatory minimum would not serve the Court's interest in ensuring that the sentence "reflect[s] the seriousness of the offense," nor would it "promote respect for the law," or "provide just punishment for the offense."  18 U.S.C. § 3553(a).  It would also fly in the face of the negotiated Plea Agreement.  *See Bond*, 56 F.4th at 384-85.

In addition, defendant's "history and characteristics" suggest that a grant of relief at this time would be premature.  As noted, defendant had four prior criminal convictions.  ECF 151, ¶¶ 29–32.  And, on two separate occasions he violated the terms of probation.  *Id.* ¶¶ 30–31.  Although defendant's criminal history certainly does not foreclose relief, it does suggest that it would be inappropriate to grant compassionate release when defendant has served a little more than half of his sentence, which corresponded to a sentence almost at the bottom of the advisory Guidelines.

I am mindful that defendant's record in prison is commendable.  He has completed at least six prison education courses, ECF 176-4 at 3–8, and, to the Court's knowledge, he has not committed any disciplinary infractions while incarcerated.  Nonetheless, these achievements, although laudable, are not sufficient to warrant compassionate release at this time.

As I see it, the "nature and circumstances of the offense" counsel against the requested relief.  Defendant was involved in trafficking more than a kilogram of cocaine and was discovered in possession of "a loaded ATM Automag .22 caliber pistol."  ECF 146 at 11.  Guns and drugs are a dangerous combination.  Given the seriousness of defendant's offenses, coupled with his prior record, I am of the view that relief is not appropriate at this juncture.

### V.  Conclusion

For the foregoing reasons, I shall deny the Motion, without prejudice to defendant's right to another motion if circumstances change, or if his medical records warrant further consideration.

An Order follows, consistent with this Memorandum Opinion.

Date: January 9, 2024

_____/s/_____
Ellen Lipton Hollander
United States District Judge

29